1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH LUIS SEPULVEDA, | Case No. 1:22-cv-01080-SAB |
| Plaintiff, | ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | (ECF Nos. 15, 16, 17) |

## I.

## INTRODUCTION

Joseph Luis Sepulveda ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' cross-motions for summary judgment, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff requests the decision of Commissioner be vacated and the case be remanded for the award of benefits or further proceedings, arguing: (1) the Administrative Law Judge erred in finding that Plaintiff's mental health impairments were non-severe impairments at step two and the resultant

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge and this action has been assigned to Magistrate Judge Stanley A. Boone for all purposes.  (See ECF Nos. 8, 10, 11.)

residual functional capacity fails to include limitations related to those impairments; (2) the Administrative Law Judge failed to include work-related limitations in the residual functional capacity consistent with the nature and intensity of Plaintiff's limitations and failed to offer any clear and convincing reasons for rejecting Plaintiff's subjective complaints and testimony; and (3) the Plaintiff medically equals Listing 4.02 for chronic heart failure.

For the reasons explained herein, Plaintiff's motion for summary judgment shall be denied, Defendant's cross-motion for summary judgment shall be granted, and Plaintiff's social security appeal shall thus be denied.

## II.

## BACKGROUND

### A.    Procedural History

On March 13, 2019, Plaintiff filed a Title II application for a period of disability insurance benefits, and on August 30, 2019, Plaintiff filed a Title XVI application for supplemental security income benefits, each alleging a period of disability beginning on November 1, 2015. (AR 246-47, 254-55.) Plaintiff's applications were initially denied on June 27, 2019, and denied upon reconsideration on December 17, 2019. (AR 111-14, 118-22.) Plaintiff requested and received a hearing before Administrative Law Judge Janice E. Barnes-Williams (the "ALJ"). (AR 124-25, 146-170.) Plaintiff appeared for a hearing before the ALJ on April 5, 2021. (AR 33-67.) On June 30, 2021, the ALJ issued a decision finding that Plaintiff was not disabled. (AR 15-32.) On June 21, 2022, the Appeals Council denied Plaintiff's request for review. (AR 1-5.)

On August 25, 2022, Plaintiff filed this action for judicial review. (ECF No. 1.) On November 16, 2022, Defendant filed the administrative record ("AR") in this action. (ECF No. 12.) Following an extension of the briefing schedule, on March 3, 2023, Plaintiff filed an opening brief in support of summary judgment. (Pl.'s Opening Br. ("Br."), ECF No. 15.) On April 17, 2023, Defendant filed an opposition brief and motion for cross-summary judgment. (Def.'s Opp'n ("Opp'n"), ECF No. 16.) Plaintiff filed a reply brief on May 2, 2023. (Pl.'s Reply Br. ("Reply"), ECF No. 17.)

**B.     The ALJ's Findings of Fact and Conclusions of Law**

The ALJ made the following findings of fact and conclusions of law as of the date of the decision, June 30, 2021:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2.  The claimant has not engaged in substantial gainful activity since November 1, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: chronic kidney disease stage 3, ischemic dilated cardiomyopathy, diabetes mellitus with neuropathy, coronary artery disease, congestive heart failure, and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  The claimant has the residual functional capacity to occasionally and frequently lift and/or carry up to 10 pounds.  He can stand and/or walk in combination for 2 hours out of 8 hours, and he can sit for 6 hours out of 8 hours.  The claimant can occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds. The claimant can occasionally stoop but never kneel.  He can occasionally crouch but never crawl.  The claimant must avoid extreme heat, excessive vibrations, extreme cold weather, and unprotected heights.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on December 27, 1972, and was 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date, and he is still a younger individual but is now age 45-49 (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because

using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 1, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(AR 17-26.)

### III.

### LEGAL STANDARD

#### A.    The Disability Standard

To qualify for disability insurance benefits under the Social Security Act, a claimant must show she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[2] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled.  20 C.F.R. § 404.1520;[3] Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1194 (9th Cir. 2004).  The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is not disabled.  If not, proceed to step two.

[2] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).

[3] The regulations which apply to disability insurance benefits, 20 C.F.R. §§ 404.1501 et seq., and the regulations which apply to SSI benefits, 20 C.F.R. §§ 416.901 et seq., are generally the same for both types of benefits. Accordingly, while Plaintiff seeks only Social Security benefits under Title II in this case, to the extent cases cited herein may reference one or both sets of regulations, the Court notes these cases and regulations are applicable to the instant matter.

Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.

Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.

Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006). The burden of proof is on the claimant at steps one through four. Ford v. Saul, 950 F.3d 1141, 1148 (9th Cir. 2020). A claimant establishes a *prima facie* case of qualifying disability once she has carried the burden of proof from step one through step four.

Before making the step four determination, the ALJ first must determine the claimant's RFC. 20 C.F.R. § 416.920(e); Nowden v. Berryhill, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018). The RFC is "the most [one] can still do despite [her] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). The RFC must consider all of the claimant's impairments, including those that are not severe. 20 C.F.R. §§ 416.920(e); 416.945(a)(2); Social Security Ruling ("SSR") 96-8p, available at 1996 WL 374184 (Jul. 2, 1996).[4] A determination of RFC is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion); 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." Vertigan v. Halter, 260 F.3d 1044, 1049

---

[4] SSRs are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner. 20 C.F.R. § 402.35(b)(1). While SSRs do not have the force of law, the Court gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989); see also Avenetti v. Barnhart, 456 F.3d 1122, 1124 (9th Cir. 2006).

1  (9th Cir. 2001).

2       At step five, the burden shifts to the Commissioner, who must then show that there are a

3  significant number of jobs in the national economy that the claimant can perform given her RFC,

4  age, education, and work experience.  20 C.F.R. § 416.912(g); Lounsburry v. Barnhart, 468 F.3d

5  1111, 1114 (9th Cir. 2006).  To do this, the ALJ can use either the Medical Vocational

6  Guidelines ("grids"), or rely upon the testimony of a VE.  See 20 C.F.R. § 404 Subpt. P, App. 2;

7  Lounsburry, 468 F.3d at 1114; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).

8  "Throughout the five-step evaluation, the ALJ is responsible for determining credibility,

9  resolving conflicts in medical testimony, and for resolving ambiguities.' " Ford, 950 F.3d at

10  1149 (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).

11      **B.**    **Standard of Review**

12       Congress has provided that an individual may obtain judicial review of any final decision

13  of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).

14  In determining whether to reverse an ALJ's decision, the Court reviews only those issues raised

15  by the party challenging the decision. See Lewis v. Apfel, 236 F.3d 503, 517 n.13 (9th Cir.

16  2001).  Further, the Court's review of the Commissioner's decision is a limited one; the Court

17  must find the Commissioner's decision conclusive if it is supported by substantial evidence.  42

18  U.S.C. § 405(g); Biestek v. Berryhill, 139 S. Ct. 1148, 1153 (2019).  "Substantial evidence is

19  relevant evidence which, considering the record as a whole, a reasonable person might accept as

20  adequate to support a conclusion."  Thomas v. Barnhart (Thomas), 278 F.3d 947, 954 (9th Cir.

21  2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995));

22  see also Dickinson v. Zurko, 527 U.S. 150, 153 (1999) (comparing the substantial-evidence

23  standard to the deferential clearly-erroneous standard).  "[T]he threshold for such evidentiary

24  sufficiency is not high."  Biestek, 139 S. Ct. at 1154.  Rather, "[s]ubstantial evidence means

25  more than a scintilla, but less than a preponderance; it is an extremely deferential standard."

26  Thomas v. CalPortland Co. (CalPortland), 993 F.3d 1204, 1208 (9th Cir. 2021) (internal

27  quotations and citations omitted); see also Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

28  Even if the ALJ has erred, the Court may not reverse the ALJ's decision where the error is

1  harmless.  Stout, 454 F.3d at 1055–56.  Moreover, the burden of showing that an error is not

2  harmless "normally falls upon the party attacking the agency's determination."  Shinseki v.

3  Sanders, 556 U.S. 396, 409 (2009).

4      Finally, "a reviewing court must consider the entire record as a whole and may not affirm

5  simply by isolating a specific quantum of supporting evidence."  Hill v. Astrue, 698 F.3d 1153,

6  1159 (9th Cir. 2012) (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).

7  Nor may the Court affirm the ALJ on a ground upon which he did not rely; rather, the Court may

8  review only the reasons stated by the ALJ in his decision.  Orn v. Astrue, 495 F.3d 625, 630 (9th

9  Cir. 2007); see also Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003).  Nonetheless, it is

10  not this Court's function to second guess the ALJ's conclusions and substitute the Court's

11  judgment for the ALJ's; rather, if the evidence "is susceptible to more than one rational

12  interpretation, it is the ALJ's conclusion that must be upheld."  Ford, 950 F.3d at 1154 (quoting

13  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).

14                                              **IV.**

15                              **DISCUSSION AND ANALYSIS**

16      Plaintiff presents three challenges: (A) the Administrative Law Judge erred in finding that

17  Plaintiff's mental health impairments were non-severe impairments at step two and the resultant

18  residual functional capacity fails to include limitations related to those impairments; (B) the

19  Administrative Law Judge failed to include work-related limitations in the residual functional

20  capacity consistent with the nature and intensity of Plaintiff's limitations and failed to offer any clear

21  and convincing reasons for rejecting Plaintiff's subjective complaints and testimony; and (C) the

22  Plaintiff medically equals Listing 4.02 for chronic heart failure.

23      **A.      The ALJ did not Commit Remandable Error at Step Two**

24      Plaintiff argues the ALJ erred in finding Plaintiff's mental health impairments non-severe at

25  step two of the sequential analysis.

26      1.      General Legal Standards

27      "An impairment or combination of impairments can be found 'not severe' only if the

28  evidence establishes a slight abnormality that has 'no more than a minimal effect on an

individual['] s ability to work.' " Smolen, 80 F.3d at 1290 (citations omitted).  Step two is a "de minimis screening devise to dispose of groundless claims."  Id., 80 F.3d at 1290.  An ALJ can only find that claimant's impairments or combination of impairments are not severe when his conclusion is clearly established by medical evidence.  Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (quoting S.S.R. 85-28).  In considering an impairment or combination of impairments, the ALJ must consider the claimant's subjective symptoms in determining their severity. Smolen, 80 F.3d at 1290.

Symptoms are not medically determinable physical impairments and cannot by themselves establish the existence of an impairment.  Titles II & XVI: Symptoms, Medically Determinable Physical & Mental Impairments, & Exertional & Nonexertional Limitations, SSR 96-4P (S.S.A. July 2, 1996).  In order to find a claimant disabled, there must be medical signs and laboratory findings demonstrating the existence of a medically determinable ailment.  Id. "[R]egardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings. . . .  In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process."  Id.

Any error in failing to find impairment severe at step two is harmless where the ALJ considers the limitations posed by the impairment in the step four analysis.  Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007); see also Buck v. Berryhill, 869 F.3d 1040, 1049 (9th Cir. 2017) (Where the ALJ ultimately decided step two in the claimant's favor, she "could not possibly have been prejudiced.").

2.    Principal Step Two Findings

At step two, the ALJ concluded Plaintiff's "medically determinable mental impairments of major depressive disorder, generalized anxiety disorder, mood disorder, anxiety disorder, and intermittent explosive disorder . . . , considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are

therefore non-severe." (AR 18.)   The ALJ supported the conclusion based on the following findings:

> In making this finding, I have considered the broad functional areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria. I find the claimant has no limitation in the areas of understanding, remembering or applying information, and in adapting or managing oneself. The claimant has mild limitation in interacting with others and in concentrating, persisting or maintaining pace.
>
> The claimant is treated for mood issues and anxiety (Exhibit 18F), but he did not discuss mental symptoms at his hearing. (Hearing Testimony.) He did not allege mental limitations or mention that his mental state impacts his ability for work. Mental health treatment has been inconsistent, with gaps in treatment. There are times when the claimant reports increased anger, rage, anxiety, feeling out of control, and other symptoms (e.g., Exhibit 18F/39), but he improves with treatment. The claimant asks to restart medication and therapy when he starts to have increased symptoms, indicating non-compliance. (Exhibit 18F/66, 83.) With treatment, he has improved mood, no anger outbursts, and he has found a new hobby—donating leftover food to the homeless, which has evolved into a food pantry he is running out of his garage. (Exhibit 18F/44.) The claimant discusses the need to find a job or hobby that will provide stimulation and self- esteem. (Exhibit 18F/56.) The claimant is doing pretty good and reports he is less moody, sleeping better, and feeling more energy. (Exhibit 18F/34.) The claimant has continued irritability at times, but he feels great physically. (Exhibit 18F/29.) The claimant is good and having less road rage. Mood is improved and there are no recent rage episodes. (Exhibit 18F/13.) The claimant and his wife are getting along well and planning a trip in the new car they bought. (Exhibit 18F/1.) The claimant manages his road rage symptoms with breathing techniques and improvement in response. He is stable and doing well overall, takes anger management classes, delivers food part-time for work, cleans the house, and is there with his children. (Exhibit 18F/143, 147, 155.)
>
> Psychiatric findings are routinely normal on exam. (Exhibit 4F/67; 12F/65, 186; 16F/12, 61; 17F/10, 84; 20F/24.) Mental status findings are largely unremarkable. There are mood issues at times (anxiety, down, irritable, depressed, etc.), but the claimant is alert, oriented, engaged, cooperative, and he has normal thought and speech as well as intact judgment and insight. (Exhibit 18F/1, 7, 13, 18, 29, 39, 56, 74, 88, 104, 121, 143-44, 155.) In a consultative examination, the claimant had unimpaired concentration, persistence, and pace; he was polite and oriented; attitude was neutral to positive; speech and thought were normal; memory was intact; calculation was correct; thinking was unimpaired; and insight and judgment were good. (Exhibit 7F.) To account for mood issue and a number of physical health problems, I find the

1

> claimant has mild limitation in interacting with others and in
> concentrating, persisting or maintaining pace.

2

3

> Because the claimant's medically determinable mental
> impairments cause no more than "mild" limitation in any of the
> functional areas and the evidence does not otherwise indicate that
> there is more than a minimal limitation in the claimant's ability to
> do basic work activities, they are nonsevere (20 CFR
> 404.1520a(d)(1) and 416.920a(d)(1)).

4

5

6  (AR 18-19.)

7       3.      The Court Concludes the ALJ did not Commit Remandable Error at Step Two

8          Plaintiff frames the ALJ's step two findings as follows: (1) the Plaintiff did not discuss

9  mental limitations at the hearing, did not allege mental limitations, or mention that his mental

10 state impacts his ability to work; (2) mental health treatment has been inconsistent; (3) his mental

11 health symptoms improve with treatment and he asks to restart therapy or medications, indicating

12 non-compliance with treatment; and (4) psychiatric findings are routinely normal or

13 unremarkable.  Plaintiff argues these reasons are not supported by substantial evidence in the

14 record.  (Br. 7-8.)  The Court turns to Plaintiff's specific arguments.

15         First, the ALJ stated: "[t]he claimant is treated for mood issues and anxiety (Exhibit 18F),

16 but he did not discuss mental symptoms at his hearing . . . did not allege mental limitations or

17 mention that his mental state impacts his ability for work."  (AR 18.)  Plaintiff highlights hearing

18 testimony in response.  The ALJ asked how Plaintiff's impairments have limited his "ability to

19 function on a day-to-day basis," and Plaintiff replied in part:

20

> Well, I had the diabetes you know, since I was like 27, 28, but it
> started affecting though with the foot ulcers, severe leg pain.
> That's when I discovered I had the neuropathy, and then from then
> it was just – I was having some mental issues and depression issues
> because I was – felt I couldn't work. I got so abusive and down on
> myself.  And then in 2017, I had a heart attack . . .

21

22

23

24 (AR 49.)

25         In briefing submitted to the Court, despite Plaintiff's highlighting of the above testimony,

26 Defendant did not directly respond addressing this statement by the ALJ or the hearing

27 testimony.  It would have been helpful to the Court for Defendant to address this argument in

28 briefing, given it is the first reasoning provided by the ALJ.  However, that is the only hearing

1    testimony highlighted by Plaintiff that relates to mental ailments.  Although Plaintiff mentioned
2    "mental and depression issues," it is followed by "because I . . . felt I couldn't work."  (AR 49.)
3    A reasonable interpretation of the ALJ's statement that is supported by substantial evidence is
4    that there was no discussion of "symptoms" or limitations or discussion of a mental state that
5    impacted the ability to work.  Rather, Plaintiff makes a conclusory statement that he got
6    depressed because he felt like he could not work due to physical conditions.  Thus giving
7    deference, an accurate interpretation of the testimony is that the Plaintiff did not specifically
8    testify regarding mental symptoms, nor that his mental state impacts his ability to work.  Further,
9    even if it was an erroneous statement based on an oversight of the hearing testimony, the other of
10   the ALJ's findings made at step two, more grounded in the medical record and overall record, are
11   supported by substantial evidence and thus this initial misstatement, if it is a misstatement, is
12   harmless at most.

13        Second, Plaintiff challenges the ALJ's findings relating to Plaintiff's mental health
14   treatment being inconsistent.  Plaintiff argues that the gap in mental health treatment between
15   April 3, 2018, and August 15, 2019, is adequately explained in the record.  Referencing a greater
16   period of time, between April 25, 2016, and November 25, 2020, Plaintiff highlights he sought
17   mental health treatment consisting of therapy and medication management approximately forty-
18   six times.  (See AR 1683, 1900, 1931, 1937, 1949, 1959, 2225, 2275, 2292, 2326, 2335, 2342,
19   2347, 2352, 2358, 2363, 2368, 2373, 2378, 2384, 2389, 2394, 2398, 2402, 2406, 2411, 2416,
20   2420, 2425, 2428, 2431, 2434, 2437, 2440, 2443, 2446, 2449, 2452, 2455, 2458, 2464.)  Plaintiff
21   proffers that when he returned to therapy on August 15, 2019, he reported that he had not been to
22   therapy for two years because of "numerous health issues in the interim" and "was living in a
23   homeless shelter through the VA for a[]while."  (AR 2411.)[5]  Plaintiff proffers the explanation of

_____

24   [5]  The Court notes that it is not clear in this citation that Plaintiff reported he did not go to therapy because of these
25   reasons.  The record states:

26        Pt. seen for tx of mood and anxiety related sx. Last seen two years ago at which time he was
         having suicidal thoughts. Denies any suicidal thoughts in the past year. Has had numerous health
27        issues in the Interim - appendicitis, gallbladder issues, stroke, kidney disease-in addition to those
         that he had when he was last seen. Was living in a homeless shelter through the VA for a[ ]while.
28        Currently living with his mother, trying to get disability (was denied). Reports a friendship with
         ex-wife, improved relationship with son. States that he is returning to therapy now because he

1   numerous interim health issues is supported by the record, and includes the following records: an

2   ER visit on July 8, 2018 for bilateral lower extremity edema (AR 1563); EGD study on July 13,

3   2018 (AR 1544); hospital admission between August 18–27, 2018, for acute appendicitis and

4   sepsis (AR 3147); ER visit for a stroke (AR 3072); gastric emptying study on October 24, 2018

5   (AR 461-62); echocardiogram on November 2, 2018 (AR 1460); left heart catheterization on

6   December 3, 2018 (AR 1432); hospital admission from January 11–18, 2019, for acute

7   cholecystitis (AR 641); hospital admission from February 2–3, 2019, for congestive heart failure

8   exacerbation (AR 631); hospital admission from February 27 through March 1, 2019, for acute

9   kidney injury and hypotension (AR 626-27); ER visit for congestive heart failure exacerbation

10  on July 1, 2019 (AR 2171); and extensive wound care for diabetic foot ulcers on his left lower

11  extremity from August 7 through September 17, 2019 (AR 2223-2240).   Plaintiff therefore

12  argues he has therefore provided an adequate explanation for the gap in his mental health

13  treatment.  See Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (an "unexplained or

14  inadequately explained failure to seek treatment or to follow a prescribed course of treatment" is

15  a factor an ALJ may consider in weighing a claimant's credibility).  Plaintiff argues the ALJ did

16  not seek out or consider any possible explanation for gaps in the Plaintiff's treatment or non-

17  compliance with treatment.

18        Plaintiff additionally argues the ALJ does not provide any citation to the record to

19  support that Plaintiff's symptoms improve with mental health treatment other than a single

20  treatment note from March 27, 2020, where he reported he was having anger management issues

21  again and wanted to restart Celexa and psychotherapy.  (AR 4799).

22        Finally, Plaintiff argues that mental status exams throughout the record document that his

23  mood was angry and irritable; affect was congruent with his mood; he displayed fair insight and

---

24         thinks he has caused major problems for himself in the past by making dumb decisions and
25         sabotaging himself. He does not want to do that anymore. Pt. states that he "accepts" that he may
           not have a whole lot of time left. We talked about making the most of the time he has.

26  (AR 2411.)  Thus, it is accurate that the record indicates these events did occur in the interim.  However, they were
27  not expressly proffered as a reason for not going to therapy.  The note also states Plaintiff was "alert, oriented,
    cooperative, engaged, attentive and thoughtful.  Thoughts are organized and goal-directed.  Thought content is
    realist.  Pt. denies HI, AH, VH.  No bizarre thought content or behavior.  Speech is clear and nonpressured.  Mood is
28  mildly anxious.  Affect is congruent, composed.  Good insight."  Id.

judgment; he was somewhat detached; his mood was anxious and frustrated; his affect was constricted; his mood was anxious and depressed; his affect was labile crying; he displayed poor insight; his mood was mildly anxious and dysphoric; his affect was tearful; his affect was dysphoric; his mood was irritable; and he scored a 26 on the PHQ-9 representing severe depressive symptoms.  (AR 1938-39, 1952, 2236, 2292, 2363, 2368, 2416, 2425, 2428, 2431, 2434, 2437, 2443.)  Plaintiff relatedly highlights the record documents behavior consistent with his mental health impairments, including that on June 30, 2016, he presented with mood dysregulation and stated, "I am pissed off now," and stormed out of the doctor's office and left without checking out (AR 2326); on October 12, 2017, during a behavioral health evaluation, he admitted to daily suicidal ideation, planning to jump in front of a train (AR 1959); on April 3, 2018, he had been off his psychotropic medications for a month due to running out of medication (AR 1684); and on May 8, 2020, Plaintiff stated his anger and rage are out of control.  (AR 2291

While the Plaintiff has identified records that could support a different conclusion, and undoubtedly has experienced a variety of serious physical ailments, Plaintiff has not demonstrated reversible error concerning the findings relating to Plaintiff's mental ailments.  The Court must defer to the decision of the ALJ where evidence exists to support more than one rational interpretation.  See Drouin v. Sullivan, 966 F.2d 1255, 1258 (9th Cir. 1992); see also Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999) (when the evidence presented could support either affirming or reversing the Commissioner's conclusions, the court cannot substitute its own judgment for that of the Commissioner); see also Burch, 400 F.3d at 680–81 (the ALJ is the fact-finder, and is entitled to choose between competing interpretations of the record).  "As [the Court] cannot say that the ALJ's interpretation of the available evidence was not rational, the ALJ's conclusions were supported by substantial evidence."  Shaibi v. Berryhill, 883 F.3d 1102, 1108 (9th Cir. 2017).

The ALJ noted at step two, while Plaintiff exhibited mood issues at times (anxiety, down, irritable, depressed, etc.), Plaintiff also presented as alert, oriented, engaged, cooperative, with normal thought and speech, as well as with intact judgment and insight, and mental-status examinations were largely normal and evidenced intact cognitive, social, and adaptive

functioning.  (AR 18–19.)  As Defendant details in briefing, while Plaintiff did display mood-related findings such as an anxious, depressed, or irritable mood (AR 1509, 1932, 1938, 1961, 2276, 2283, 2292, 2316, 2331), at other times, he presented with a normal mood and affect and a positive attitude (AR 388, 1070 1684, 1901, 1952, 2170–71, 2215, 2223, 2227, 2237, 2279–80).  Plaintiff was noted as being well groomed; maintained polite, cooperative, and friendly behavior; had normal speech, eye contact, and thought content; unimpaired concentration, persistence, pace, and thought processes; intact cognition, memory, fund of knowledge, and calculation abilities; and good judgment, insight and impulse control.  (AR 18, 368, 1070, 1508, 1684, 1901, 1953, 1961–62, 2214–16, 2223, 2227, 2237, 2276–77, 2279–80, 2283–84, 2298).  Thus, there is substantial evidence supporting the ALJ's finding that Plaintiff's normal mental-status examinations did not support, and contradicted, a severe mental impairment.  See Burch, 400 F.3d at 680–81; Shaibi, 883 F.3d at 1108.

The ALJ also found Plaintiff's demonstrated capabilities did not support a finding of a severe mental impairment.  (AR 18, 22–24, 41, 57–58, 310, 312, 1600, 1949, 2214, 4803).  The Court finds there is substantial evidence in the record to support a finding that for the majority of the alleged disability period, Plaintiff engaged in a range of activities of daily living that entailed cognitive, social, and adaptive capabilities.  (AR 18, 22–23.)  Plaintiff was able to maintain a marital relationship, prepare meals, do laundry and housekeeping, shop in stores, drive and attend events for his children, work part time delivering food, run a food pantry out of his garage, and independently maintain his personal care.  (AR 18, 22–24, 41, 57–58, 310, 312, 1600, 1949, 2214, 4803, 4876).

The Court finds substantial evidence to support the ALJ's finding that Plaintiff's treatment history—both its efficacy and Plaintiff's non- compliance—also failed to support the presence of a severe mental impairment.  (AR 18.)  The ALJ explained that Plaintiff's longitudinal treatment records evidenced inconsistent mental- health treatment (AR 18).  As Defendant highlights, while Plaintiff took psychotropic medication and engaged in therapy, he did not appear to maintain this treatment regularly, opting instead to wait until his symptoms increased and then requesting to restart medication and therapy; and once he was restarted on his

1    prescribed treatment, his symptoms improved.  (AR 18, 1684 (medication was helpful with no

2    adverse effects, and stated that he sought to resume taking it because his symptoms had

3    increased).[6]  On April 1, 2020, Plaintiff sought mental-health treatment after a five-month lapse

4    (AR 18, 4799.)  Plaintiff stated that he had been having issues with anger management again and

5    would like to restart medication (Celexa) and psychotherapy.  (AR 18, 4799).  Notably, even

6    without any treatment for five months and despite his reports, aside from an anxious mood, his

7    mental-status examination was normal—he was alert, oriented, cooperative, engaged, energetic,

8    attentive, and thoughtful; he had organized and goal-directed thought processes; his thought

9    content was realistic; he denied suicidal and homicidal ideations and hallucinations; he had no

10   bizarre thought content or behavior; he was spontaneously verbal; his speech was clear and non-

11   pressured; his affect was congruent and composed; and he had fair insight.  (AR 18, 4799.)

12        By June 16, 2020, Plaintiff reported that his mood had improved, he had had no

13   outbursts, he had found a new hobby (running a food pantry out of his garage), and he was

14   mindful of having a peaceful home and happy life.  (AR 18, 4777.)  His mental-status

15   examination was normal.  (AR 18, 4777.)  On July 27, 2020, he reported that with a medication

16   increase, he was doing pretty good, had been less moody, and was sleeping better and feeling

17   more energized.  (AR 18, 4767.)  On September 24, 2020, he reported that he was doing well

18   with medication.  (AR 19, 4880.)  On October 14, 2020, he reported that he was doing good,

19

---

20   [6] This record, states:

21           Currently not taking any psychotropics x 1 month as he ran out of meds.  He says he had refills but never used them as he "wanted to see how I did without

22           them."  When he was actively taking Citalopram, VPA, and Zolpidem, he found the meds helpful with no adverse effects.  He desires to resume meds as he

23           occasionally finds himself "getting upset and irritable over small things, it angers me for no apparent reason … My wife says I'm acting like an asshole."

24           Sleeps 3-4 hrs/night and has sleep study pending this Saturday.  Has trouble falling asleep.  No nightmares.

25           Veteran currently works with CWT pgm, employed in Cafeteria at VACCHCS.

26           Overall, Veteran the job is going well.  Married twice, currently separated from current wife.  Two adult children from prior marriage.  Lives in Fresno with dtr

27           and her 2 children.  Active in Church, reads bible & attends services twice weekly.

28   (AR 1684.)

1  having less road rage, and experiencing improvements in his relationship with his wife.  (AR 18,

2  4756.)  On October 23, 2020, he reported much improvement with medication.  (AR 18, 4877.)

3  On November 25, 2020, he reported that his mood had improved, he had had no recent road rage

4  episodes, and his family was getting along well.  (AR 18, 4746.)  On March 9, 2021, he reported

5  that he was doing okay, he and his wife were getting along and planning a trip, and he had more

6  control over his emotions.  (AR 18, 4734.)  The ALJ's finding that Plaintiff was able to manage

7  his mental symptoms with treatment when compliant was proper and supported by the record,

8  and thus the Court finds substantial evidence to support the ALJ's finding that Plaintiff's

9  treatment history—both its efficacy and Plaintiff's non- compliance—also failed to support the

10  presence of a severe mental impairment.  See Burch, 400 F.3d at 680–81; Shaibi, 883 F.3d at

11  1108.

12      Additionally, the ALJ found that the weight of the opinion evidence did not support the

13  presence of a severe mental impairment.  (AR 24.)[7]  On June 26, 2019, citing to evidence of

14  Plaintiff's normal mental-status examination findings, demonstrated capabilities, and good

15  response to treatment, Mark Berkowitz, Psy.D., concluded that the evidence did not establish that

16  Plaintiff had a severe mental impairment.  (AR 24, 75–76.)  On December 17, 2019, Alan

17  Berkowitz, M.D., noted that Plaintiff did not allege any worsening in his condition and, upon a

18  re-review, agreed with Dr. Mark Berkowitz's assessment of no severe mental impairment.  (AR

19  24, 88.)  The medical opinions constituted additional substantial evidence supporting the ALJ's

20  decision because they were consistent with other evidence in the record, including Plaintiff's

21  normal mental-status examinations, Plaintiff's demonstrated capabilities, and Plaintiff's

22  treatment history.  See Thomas, 278 F.3d at 957 ("The opinions of non-treating or non-

23  examining physicians may also serve as substantial evidence when the opinions are consistent

24  with independent clinical findings or other evidence in the record.").

25      As for Plaintiff's highlighting of certain records and arguments regarding the gap in

26  mental health treatment, Defendant responds that, as the ALJ explained, Plaintiff's mood-related

27  _____

28  [7]  Defendant cites to AR 28 in this section of argument, however, it appears Defendant meant to cite to AR 24.  (See Opp'n 16.)

findings did not generally impair his mental functioning, and despite mood-related findings, the records Plaintiff cites show that he largely maintained intact cognitive, social, and adaptive functioning including, but not limited to, cooperative, friendly, engaged, energetic, attentive, and thoughtful behavior; good grooming; normal speech; normal eye contact; linear and goal-directed thought processes; intact cognition, attention; concentration, and focus; normal thought content and fund of knowledge; unimpaired memory; normal motor activity; and intact insight, judgment, and impulse control.  (AR 18, 1684, 1938, 1952–53, 1961, 2292, 2326, 2363, 2368, 2425, 2428, 2431, 2434, 2437, 2443.)

Defendant submits that because Plaintiff fails to establish reversible error in the ALJ's reliance on the medical evidence, the Court need not address his argument concerning his gap in mental health treatment, even if that finding presented error.  See Carmickle v. Comm'r, 533 F.3d 1155, 1162 (9th Cir. 2008) ("the relevant inquiry in this context is not whether the ALJ would have made a different decision absent any error . . . it is whether the ALJ's decision remains legally valid, despite such error.").  Nonetheless, the Court finds that even if the other reasons given by the ALJ would not stand alone, the Court agrees with Defendant that Plaintiff has not established reversible error regarding the gap in treatment.  Plaintiff argues a two-year gap in treatment preceding an August 15, 2019 visit was justified because he was unable to obtain care due to health issues and life circumstances.  However, as Defendant highlights, the evidence from August of 2017 through August of 2019 indicated otherwise, as for example, on August 7, 2018, Plaintiff reported that he was doing fine; that he was working swing shifts (which he said were going well); and he was "active" in his church, reading the bible daily, attending services weekly, and planning an international mission trip.  (AR 1508.)  Plaintiff was also able to attend routine medical appointments for his physical impairments during this two-year period, and physical examinations were normal.  (AR 2106, 2114, 2125, 2133).

Accordingly, the Court finds the ALJ's step two determination to be reasonable, supported by substantial evidence in the record, and free from legal error warranting remand.

/ / /

/ / /

**B.** **The Court Finds the ALJ's RFC Determination Proper and Weighing of Plaintiff's Subjective Complaints and Testimony Supported by Clear and Convincing Reasons**

Plaintiff argues the ALJ failed to include work-related limitations in the residual functional capacity consistent with the nature and intensity of Plaintiff's limitations and failed to offer any clear and convincing reasons for rejecting Plaintiff's subjective complaints and testimony.

     1.    <u>General Legal Standards</u>

     **a.**    **RFC**

The RFC is an assessment of the sustained, work-related physical and mental activities the claimant can still do on a regular and continuing basis despite his limitations. 20 C.F.R. §§ 404.1520(e), 404.1545(a), 416.945(a); <u>see also</u> <u>Valencia v. Heckler</u>, 751 F.2d 1082, 1085 (9th Cir. 1985) (RFC reflects current "physical and mental capabilities"); SSR 96-8p, at *2. Thus, it represents the maximum amount of work the claimant is able to perform based on all the relevant evidence in the record. <u>See id.</u>; <u>see also</u> 20 C.F.R. § 416.945(a)(3) (RFC determination must be "based on all of the relevant medical and other evidence."). As previously noted, the RFC is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. <u>See</u> 20 C.F.R. §§ 404.1527(d)(2); 404.1546(c); <u>Vertigan</u>, 260 F.3d at 1049 ("It is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity.") (citing 20 C.F.R. § 404.1545). And where "the record contains conflicting medical evidence, the ALJ is charged with determining credibility and resolving the conflict." <u>Benton v. Barnhart</u>, 331 F.3d 1030, 1040 (9th Cir. 2003); <u>Batson</u>, 359 F.3d at 1195; <u>see also</u> <u>Lingenfelter</u>, 504 F.3d at 1042 ("When evaluating the medical opinions of treating and examining physicians, the ALJ has discretion to weigh the value of each of the various reports, to resolve conflicts in the reports, and to determine which reports to credit and which to reject."); <u>Morgan v. Comm'r of Soc. Sec. Admin.</u>, 169 F.3d 595, 603 (9th Cir. 1999) (holding that ALJ was "responsible for resolving conflicts" and "internal inconsistencies" within doctor's reports); <u>Tommasetti</u>, 533 F.3d at 1041–42 ("[T]he ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence.").

1    In reviewing whether an ALJ committed error in determining the RFC, the relevant

2    inquiry is whether the medical evidence supports the ALJ's finding.  Stubbs-Danielson v. Astrue,

3    539 F.3d 1169, 1173-74 (9th Cir. 2008) (holding the RFC assessment adequately captures

4    restrictions if it is consistent with the concrete limitations in the medical opinions); see also

5    Schneider v. Comm'r, 433 Fed. Appx. 507, 509 (9th Cir. 2011) (ALJ's failure to address

6    claimant's migraines was harmless because medical record did not support finding that migraines

7    would affect claimant's functioning at work).  Accordingly, "[t]he ALJ's RFC determination

8    need not precisely reflect any particular medical provider's assessment."  Althoff-Gromer v.

9    Comm'r of Soc. Sec., No. 2:18-cv-00082-KJN, 2019 WL 1316710, at *13 (E.D. Cal. Mar. 22,

10   2019) (citing Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222–23 (9th Cir. 2010)); see also

11   Chavez v. Colvin, 654 Fed. App'x 374, 375 (10th Cir. 2016) (ALJ need not "parrot … exact

12   descriptions of … limitations" to reach an RFC determination consistent with the medical record

13   and claimant's limitations).

14           **b.      Weighing Subjective Testimony**

15           A claimant's statements of pain or other symptoms are not conclusive evidence of a

16   physical or mental impairment or disability.  42 U.S.C. § 423(d)(5)(A); SSR 16-3p; see also Orn,

17   495 F.3d at 635 ("An ALJ is not required to believe every allegation of disabling pain or other

18   non-exertional impairment.").  Rather, an ALJ performs a two-step analysis to determine

19   whether a claimant's testimony regarding subjective pain or symptoms is credible.  See Garrison

20   v. Colvin, 759 F.3d 995, 1014 (9th Cir. 2014); Smolen, 80 F.3d at 1281; SSR 16-3p, at *3.  First,

21   the claimant must produce objective medical evidence of an impairment that could reasonably be

22   expected to produce some degree of the symptom or pain alleged.  Garrison, 759 F.3d at 1014;

23   Smolen, 80 F.3d at 1281–82.  If the claimant satisfies the first step and there is no evidence of

24   malingering, "the ALJ may reject the claimant's testimony about the severity of those symptoms

25   only by providing specific, clear, and convincing reasons for doing so."  Lambert v. Saul, 980

26   F.3d 1266, 1277 (9th Cir. 2020) (citations omitted).

27           If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other

28   limitations is unreliable, the ALJ must make a credibility determination citing the reasons why

1   the testimony is unpersuasive.  The ALJ must specifically identify what testimony is credible and

2   what testimony undermines the claimant's complaints.  In this regard, questions of credibility

3   and resolutions of conflicts in the testimony are functions solely of the Secretary.  Valentine v.

4   Astrue, 574 F.3d 685, 693 (9th Cir. 2009) (quotation omitted); see also Lambert, 980 F.3d at

5   1277.

6        In addition to the medical evidence, factors an ALJ may consider include the location,

7   duration, and frequency of the pain or symptoms; factors that cause or aggravate the symptoms;

8   the type, dosage, effectiveness or side effects of any medication; other measures or treatment

9   used for relief; conflicts between the claimant's testimony and the claimant's conduct—such as

10  daily activities, work record, or an unexplained failure to pursue or follow treatment—as well as

11  ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, internal

12  contradictions in the claimant's statements and testimony, and other testimony by the claimant

13  that appears less than candid.  See Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014);

14  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008); Lingenfelter, 504 F.3d at 1040;

15  Smolen, 80 F.3d at 1284.  Thus, the ALJ must examine the record as a whole, including

16  objective medical evidence; the claimant's representations of the intensity, persistence and

17  limiting effects of her symptoms; statements and other information from medical providers and

18  other third parties; and any other relevant evidence included in the individual's administrative

19  record.  SSR 16-3p, at *5.

20       2.    The Court finds no Remandable Error

21       Plaintiff frames the ALJ's reasons given for discounting the testimony as follows: (1) his

22  symptoms are stable or improved with treatment; (2) he is non-compliant with treatment; (3) he

23  has largely normal musculoskeletal and neurological findings; (4) absence of medical evidence

24  establishing need for an assistive device; and (5) the wide range of daily activities he is able to

25  perform.  (AR 20-24).  Plaintiff argues the ALJ failed to support any of these rationales, failed to

26  provide clear and convincing reasons for discounting the Plaintiff's testimony, and that the RFC

27  determination is not supported by substantial evidence.  For the reasons explained below, the

28  Court finds the ALJ provided sufficient clear and convincing reasons for discounting the subject

1  symptom testimony, and issued a proper RFC determination supported by substantial evidence,

2  and free from error warranting remand.

3         **a.**      **Improvement with Treatment and Noncompliance with Treatment**

4        Although Plaintiff's arguments are reasonable challenges based on Plaintiff's physical

5  ailments,[8] the Court finds the ALJ's reliance on improvement with treatment, in conjunction with

6  demonstrated noncompliance, sufficient under Ninth Circuit law.

7        Defendant argues the ALJ properly found that although Plaintiff experienced significant

8  symptoms, his symptoms often improved, if not resolved, with proper treatment.  (AR 21–22,

9  23).  Defendant highlights Plaintiff he was able to resolve his DVT, shortness of breath, chest

10  pain, and edema with treatment (AR 21, 388, 473, 656, 685, 691, 761, 802, 867, 908, 957, 2064,

11  2171, 2539.)  Plaintiff argues that he continued to experience symptoms, however, as Defendant

12  notes, this was not disputed given the ALJ identified Plaintiff's significant medical events,

13  discussed Plaintiff's ongoing symptoms, and accounted for attendant limitations in Plaintiff's

14  restrictive RFC, as further discussed below.

15        Significantly and relatedly, the Court agrees with Defendant that Plaintiff's own non-

16  compliance hampered the efficacy of his treatment, and the Court finds such non-compliance

17  was sufficiently documented and thus supported by substantial evidence in the record.  His

18  treating medical provider emphasized the importance of using his CPAP machine, and Plaintiff

19  was non-compliant because he did not like to use it (AR 21–22, 4146, 4336, 5114, 5155);

20  Plaintiff failed to take his heart medication as prescribed (AR 21, 24, 2157, 2545, 4025); and

21  Plaintiff's diabetes was uncontrolled with a poor prognosis because he was "very" non-compliant

22  with treatment (AR 22, 385, 1964, 2108, 2126, 3382, 4803; see also AR 1516 (missed

23  appointments), 1684 ("not taking any psychotropics x1 month as he ran out of meds"), 1964 ("pt

24

---

25  [8]  For example, Plaintiff argues, regarding the Plaintiff's kidney issues, that while on July 29 and October 7, 2019, Plaintiff's kidney function was noted as doing much better, he was still weak, and his creatinine was improving or

26  stable (AR 2071-72, 2075); that on December 24, 2019, the Plaintiff went to the ER for acute kidney injury/failure, his blood work was abnormal with high creatinine, and he received IV fluids for dehydration (AR 4381-82); that on

27  July 4, 2020, the Plaintiff presented to the ER with intermittent back/kidney pain for 1 week with 8/10 pain (AR 4354); and on July 20, 2021, it was noted that Plaintiff's kidney function had only "slightly improved" with

28  treatment.  (AR 4263.)

1    states he is not compliant with diet modifications in the past"), 2084 (identifying non-compliance

2    as an active problem), 2108 ("poorly controlled diabetes patient is very noncompliant"), 2126

3    ("Prognosis poor patient is very noncompliant with diabetes and overall care"), 3382 (ran out of

4    diabetes medication), 4582 (ran out of medication), 4619 ("I am not sure patient is very

5    compliant with his medications because he was never compliant [with] medications in the past").

6        The Court agrees with Defendant that while Plaintiff addresses some instances of non-

7    compliance, the explanations do not address the pervasiveness of his non-compliance or offer an

8    adequate explanation, in light of the entirety of the record and the entirety of the ALJ's opinion.

9    For example, Plaintiff argues that he had pharmacy issues filling his heart medication in

10   September of 2019, but the record did not contain any evidence of a pharmacy being unable to

11   fill his prescription or establish that he could not obtain his heart medication from another

12   pharmacy.  Plaintiff also argues that he could not afford his medication, yet the record was

13   devoid of any evidence that he sought any low-cost or no-cost alternatives.  See Karabajakyan v.

14   Berryhill, 713 Fed. App'x. 553, 555 (9th Cir. 2017) (unpublished) ("Even if [claimant] had

15   limited funds and no medical insurance, the ALJ permissibly concluded that [his] ability to seek

16   and obtain low-cost medical care during the relevant period supports a reasonable inference that

17   he could have obtained some cardiac care had his symptoms from his heart condition been as

18   disabling as he reported") (citations omitted); Bubion v. Barnhart, 224 Fed. App'x. 601, 604 (9th

19   Cir. 2007) (unpublished) (affirming adverse finding based on lack of medical care where, among

20   other evidence, the claimant did not present proof she lacked medical coverage); Goff v.

21   Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) (rejecting claimant's argument she failed to take

22   pain medication because she could not afford it absent evidence she was denied medical

23   treatment for financial reasons).  As Defendant further highlights, Plaintiff does not explain why

24   he failed to take his heart medication as prescribed on various other occasions.  (See AR 2157

25   ("recently ran out of Bumex, caused him to retain fluid"), 2545 ("ran out Lasix"), 4025 ("Ran

26   out of Bumex"), 4619 ("he was never compliant with medications in the past").)

27        Additionally, as Defendant argues, Plaintiff's argument that the record did not evidence

28   non-compliance with his diabetes treatment is contradicted by the record, as there is sufficient

1   evidence in the record that shows Plaintiff's diabetes was uncontrolled with a poor prognosis

2   because he was "very" non-compliant with his prescribed treatment throughout the alleged

3   disability period.   (AR 22, 385 ("history of longstanding diabetes, very noncompliant with

4   medications"), 1964 ("pt states he is not compliant with diet modifications in the past"), 2108

5   ("poorly controlled diabetes patient is very noncompliant"), 2126 ("Prognosis poor patient is

6   very noncompliant with diabetes and overall care"), 3382 ("diabetic neuropathy, ran out of meds

7   unable to see PCP").)

8       Therefore, the Court finds the ALJ's findings concerning efficacy of treatment and

9   noncompliance with medication, present clear and convincing reasons for discounting Plaintiff's

10  subjective testimony.  "Even assuming without deciding that the medical evidence could support

11  conflicting inferences, the court must defer to the Commissioner where the evidence is

12  susceptible to more than one rational interpretation."   Quinones v. Astrue, No. CV 08-7225

13  AGR, 2009 WL 3122880, at *3 (C.D. Cal. Sept. 25, 2009) (citing Moncada v. Chater, 60 F.3d

14  521, 523 (9th Cir. 1995)); see also Andrews, 53 F.3d at 1039 ("The ALJ is responsible for

15  determining credibility, resolving conflicts in medical testimony, and for resolving

16  ambiguities.").  So long as substantial evidence supports the ALJ's assessment of a claimant's

17  subjective complaint, the Court will not engage in "second-guessing."  Thomas, 278 F.3d at 959;

18  see also Davis v. Berryhill, 736 Fed. App'x 662, 665 (9th Cir. 2018) ("Though [the claimant]

19  may disagree with the ALJ's interpretation of the record, the latter's interpretation is supported

20  by substantial evidence, which precludes the Court from engaging in second-guessing.").  Thus,

21  while Plaintiff may seek to suggest an alternative interpretation of this evidence, such is not

22  sufficient to establish reversible error.  See Ford, 950 F.3d at 1154; Burch, 400 F.3d at 679

23  (citations omitted).

24       **b.    Daily Activities ("ADLs")**

25       Another reason the ALJ provided for discounting Plaintiff's testimony was his ADLs.

26  See Smartt v. Kijakazi, 53 F.4th 489, 499 (9th Cir. 2022) ("An ALJ may also consider whether

27  the claimant engages in activities inconsistent with the alleged symptoms.").

28       Plaintiff argues the ALJ does not explain how the Plaintiff's limited ability to perform

some self-care and household tasks, depending on the severity of his symptoms, is inconsistent with his statements and testimony; that Plaintiff testified during the hearing that within the last six months or so, he is no longer able to cook like he used to, and his wife helps him with showering and dressing; and that the ALJ asserts this testimony is inconsistent with the Plaintiff's Function Report where he indicates he has no problem with self-care tasks, but there is no inconsistency as the Plaintiff's function report is dated March 20, 2019, while the hearing took place on April 5, 2021, over two years later.  Plaintiff also argues the ALJ misinterprets the Plaintiff's testimony during the hearing, as he testified that he goes to church once a month, not once a week; that he was doing general household chores as a family effort before six months ago; and his sons do the yard work.[9]

Defendant responds that, among other allegations, Plaintiff stated that he could not even walk to his mailbox without having to stop several times due to shortness of breath (AR 20, 50), however, while he claimed that his heart conditions precluded almost any activity, he engaged in a range of activities of daily living that suggested otherwise.  (AR 18, 22–24.)  Specifically, during the alleged disability period, Plaintiff stated he had no issues maintaining his personal care, he prepared meals, did laundry and other housekeeping activities, drove his children to school and attended events with them, ran a food pantry out of his garage, delivered food part-time, and shopped in stores, among other significant activities of daily living.  (AR 18, 22–24, 41, 57–58, 310, 312, 1600, 1949, 2214, 4803, 4876).  Defendant argues the ALJ reasonably found that Plaintiff demonstrated a level of functioning that exceeded Plaintiff's allegations and better supported the limited range of work carved out in Plaintiff's RFC.

As for Plaintiff's more direct arguments, Defendant submits the crux of Plaintiff's argument is that he testified that his activities of daily living dramatically decreased in approximately October of 2020.  (Br. 16, citing AR 54–55.)  However, Defendant emphasizes that Plaintiff alleged that he was totally and permanently disabled since November of 2015 (AR

---

[9]  Although Defendant did not directly address this contention, the Court notes that the ALJ referenced the function report in this regard, stating "[i]n his function report the claimant indicated he shops in stores for food and he attends church once per week."  (AR 23.)  This is accurate as the Plaintiff wrote he goes to church once a week.  (AR 313.)

15), and even accepting, arguendo, Plaintiff's testimony, the ALJ properly relied on Plaintiff's own reports of his activities of daily living throughout the vast majority of the alleged disability period, from November of 2015 through October of 2020.  Defendant argues that contrary to Plaintiff's testimony at the merits hearing, Plaintiff did not report any significant worsening to his medical providers, and that in October of 2020 and into 2021, Plaintiff reported that he was doing well, getting along with his family, and planning a trip (AR 18, 4756, 4877, 4746); that on November 4, 2020, he had a routine appointment and reported that his diabetes and "multiple other problems [were] doing fairly well" (AR 2711); on February 17, 2021, he had a routine appointment for medication refills and reported that he had no new complaints and his recent laboratory work looked decent (AR 21, 2667); and moreover, general, respiratory, cardiovascular, musculoskeletal, and neurologic examinations were all normal (AR 2678 (Feb. 17, 2021), 2709 (Dec. 16, 2020), 2722 (Nov. 4, 2020), 2735 (Sept. 30, 2020)).

Ninth Circuit caselaw demonstrates that ADLs may be grounds for discounting allegations that an impairment is so severe it is totally debilitating, even if such activities are not directly transferrable to a work setting.  See Molina v. Astrue, 674 F.3d 1104, 1112–13 (9th Cir. 2012) (noting "the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferrable to a work setting … [and] [e]ven where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.") (internal citations omitted); see also Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989) (affirming the ALJ's decision where the claimant's allegations were inconsistent with activities of personal care, shopping, chores, riding public transportation, and driving); Burch, 400 F.3d at 680 (finding the ALJ properly discounted the claimant's allegations where the claimant's activities suggest higher functionality, including caring for personal needs, cooking, cleaning, shopping, and interacting with family).  As the Ninth Circuit has explained, "[e]ven where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."  Molina, 674 F.3d at 1113; Valentine, 574 F.3d at 694 (while daily activities "did

1    not suggest [Plaintiff] could return to his old job [they] did suggest that [Plaintiff's] later claims

2    about the severity of his limitations were exaggerated").

3         The Court finds the ALJ's reliance on Plaintiff's reporting of various daily activities

4    throughout a large portion of the relevant period is supported by substantial evidence in the

5    record, and is a clear and convincing reason for discounting the Plaintiff's allegations of

6    disabling symptoms.

7         **c.      Examination Findings and RFC Overall[10]**

8         Plaintiff argues the ALJ references physical exams that contain normal musculoskeletal

9    and neurological findings, however, throughout the record, there are numerous physical exams

10   that document the Plaintiff's diabetic foot ulcers and decreased sensation (AR 417, 440, 468,

11   1632, 1652, 1669, 4108, 4214); numerous physical exams that document bilateral lower

12   extremity pitting edema (AR 1512-13, 1522, 1535-36, 1578, 1642, 4334); as well as diagnostic

13   testing, operative reports, and procedures that substantiate the Plaintiff's symptoms from his

14   congestive heart failure, diabetic neuropathy, and diabetic foot ulcers, including right hallux

15   amputation (AR 390, 641, 1432, 1460, 3070, 3072, 4058, 4144, 4939-40, 5213-15).

16        Subjective pain testimony "cannot be rejected on the sole ground that it is not fully

17   corroborated by objective medical evidence."  See Vertigan, 260 F.3d at 1049 ("The fact that a

18   claimant's testimony is not fully corroborated by the objective medical findings, in and of itself,

19   is not a clear and convincing reason for rejecting it."); see also 20 C.F.R. § 404.1529(c)(2)

20

21   [10]  As for the assistive device, Defendant argues it is unclear why Plaintiff dedicates a section of his brief to the use
22   of an assistive device, as the ALJ did not discount Plaintiff's subjective symptoms because the record did not
     establish the medical need for a device, as Plaintiff asserts, but rather found Plaintiff could perform the reduced
23   range of sedentary work set forth in Plaintiff's RFC without an assistive device because the record did not contain
     the requisite evidence showing that it was medically necessary.  Plaintiff replies that Defendant's assertion that the
24   ALJ did not discount Plaintiff's symptoms because the record did not establish the medical need for an assistive
     device is without merit as the ALJ formulated a reduced sedentary RFC based in part on the "absence of medical
25   evidence establishing the need for an assistive device."  (AR 24.)  The Court finds no error.  Plaintiff himself did not
     appear to assert that he required an assistive device to ambulate or balance—he stated simply that he used a cane as
26   needed.  (AR 20, 23, 51 ("I do have a cane. I'm, you know, a proud Mexican here, I don't like to use stuff like that,
     but I have it in case I need it . . . When is the last time you used it? . . . Probably a couple weeks ago when I came
27   out of the hospital, I was using that for a little while to help me get around because I wasn't very stable on my feet,
     so I'm basically using that for balance.").)  As Defendant notes, there was no evidence a cane was ever prescribed,
28   and Plaintiff's treating medical providers did not consistently observe that he used an assistive device at medical
     appointments.  (AR 23.)  While Plaintiff notes that he was prescribed a knee scooter, this was just a temporary
     measure to address the irrigation and debridement of his left foot.

1   ("[W]e will not reject your statements about the intensity and persistence of your pain or other

2   symptoms or about the effect your symptoms have on your ability to work solely because the

3   available objective medical evidence does not substantiate your statements."). Rather, where a

4   claimant's symptom testimony is not fully substantiated by the objective medical record, the ALJ

5   must provide an additional reason for discounting the testimony. See Burch, 400 F.3d at 680–81;

6   Stobie v. Berryhill, 690 Fed. App'x 910, 911 (9th Cir. 2017).

7           Nevertheless, the medical evidence "is still a relevant factor in determining the severity

8   of [the] claimant's pain and its disabling effects." Burch, 400 F.3d at 680–81; Rollins, 261 F.3d

9   at 857; SSR 16-3p (citing 20 C.F.R. § 404.1529(c)(2)). Indeed, Ninth Circuit caselaw has

10  distinguished testimony that is "uncorroborated" by the medical evidence from testimony that is

11  "contradicted" by the medical records, deeming the latter sufficient on its own to meet the clear

12  and convincing standard. See Hairston v. Saul, 827 Fed. App'x 772, 773 (9th Cir. 2020)

13  (quoting Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1160 (9th Cir. 2008)

14  (affirming ALJ's determination claimant's testimony was "not entirely credible" based on

15  contradictions with medical opinion)) ("[c]ontradiction with the medical record is a sufficient

16  basis for rejecting the claimant's subjective testimony."); see also Woods v. Comm'r of Soc. Sec.

17  (Woods I), No. 1:20-cv-01110-SAB, 2022 WL 1524772, at *10 n.4 (E.D. Cal. May 13, 2022)

18  ("While a *lack* of objective medical evidence may not be the sole basis for rejection of symptom

19  testimony, inconsistency with the medical evidence or medical opinions can be  sufficient."

20  (emphasis in original)).

21          The Court finds Plaintiff only points to alternative excerpts of the record that he claims

22  could support a different result. The Court concludes the ALJ considered the medical evidence

23  as a whole and properly accounted for the totality of the evidence in Plaintiff's restrictive RFC.

24  (AR 20–24.) See Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (" If the record

25  would support more than one rational interpretation, we defer to the ALJ' s decision" ); Burch,

26  400 F.3d at 679 (" Where evidence is susceptible to more than one rational interpretation, it is

27  the ALJ' s conclusion that must be upheld" ); Batson v. Comm'r of Soc. Sec., 359 F.3d 1190,

28  1193 (9th Cir. 2004) ("the Commissioner's findings are upheld if supported by inferences

reasonably drawn from the record").

Relatedly and to Plaintiff's arguments concerning the RFC determination, the Court notes the ALJ's adverse credibility determination does not indicate a complete rejection of Plaintiff's pain allegations. To the contrary, the ALJ considered Plaintiff's allegations and the objective medical evidence supporting much of Plaintiff's pain testimony, as well as medical opinions, and this is reflected in the RFC determination limiting Plaintiff to sedentary work with additional limitations:

> I have considered all the claimant's impairments, including chronic kidney disease stage 3, ischemic dilated cardiomyopathy, diabetes mellitus with neuropathy, coronary artery disease, congestive heart failure, and obesity. After review of the entire record, I find the claimant is able to perform sedentary-type work, with additional limitations. The ability to perform sedentary work is supported by the controlled nature of symptoms with treatment, evidence of non-compliance and subsequent improvement with medication, stability in conditions with treatment, largely normal musculoskeletal and neurological findings, absence of medical evidence establishing need for an assistive device, and the claimant's wide range of daily activity throughout a majority of the period in question.
>
> The claimant is further limited in that he can occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds due to shortness of breath. The claimant can occasionally stoop but never kneel. He can occasionally crouch but never crawl. The claimant must avoid extreme heat, excessive vibrations, extreme cold weather, and unprotected heights, due to cardiovascular concerns, chronic symptoms, diabetes, and any side effects to medication.
>
> In determining the residual functional capacity, I find the prior administrative findings of the state agency psychological consultants are persuasive, as they are supported by the evidence and they are consistent with the record. (Exhibit 1A; 3A; 4A.) A determination the claimant's mental impairments is consistent with the record for the reasons discussed, including the claimant's hearing testimony emphasizing physical symptoms, improvement with treatment, and the largely normal mental status findings of record.
>
> The prior administrative findings of the state agency medical consultant are persuasive, as they are supported by the evidence and they are consistent with the record. (Exhibit 1A; 3A; 4A.) The record supports the claimant can perform sedentary work, with additional limitations, for the reasons discussed including the controlled nature of symptoms with treatment, evidence of non-compliance and subsequent improvement with medication, stability in conditions with treatment, largely normal

musculoskeletal and neurological findings, absence of medical evidence establishing need for an assistive device, and the claimant's wide range of daily activity. I find the claimant is slightly more limited posturally due to cardiovascular concerns.

The opinion of the consultative psychological examiner at Exhibit 7F is unpersuasive. He found moderate social and adaptation limitations, after a one-time video conference evaluation of the claimant. The opinion is inconsistent with the record as a whole showing the claimant's wide range of daily activity as discussed (care for children, housekeeping, cooking, and driving/transportation for his children), as well as the normal psychiatric findings on exam and ability to shop in stores and attend his daughter's dance events.

(AR 23-24.)

Based on the arguments presented, as well as the ALJ's opinion and record as a whole, the Court concludes the ALJ provided multiple clear and convincing reasons for discounting the symptom testimony, and that while the medical evidence supported significant physical functional deficits, the ALJ accounted for these deficits by limiting Plaintiff to a very narrow range of sedentary-exertional work, and the ALJ properly found that the restrictive RFC adequately accounted for Plaintiff's significant limitations as well as his residual functioning. See Smartt, 53 F.4th at 494 ("Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed.") (citation omitted); Kaufmann v. Kijakazi, 32 F.4th 843, 851 (9th Cir. 2022) ("Looking to *all* the pages of the ALJ's decision, the court held that, contrary to its original ruling, the ALJ had, in fact, explained which daily activities conflicted with which parts of Claimant's testimony.") (emphasis in original); Razaqi v. Kijakazi, No. 1:20-CV-01705-GSA, 2022 WL 1460204, at *5 (E.D. Cal. May 9, 2022) ("The ALJ did not necessarily match each piece of evidence with the testimony it purportedly undermined, but no controlling precedent requires that level of specificity.  No inferential leaps are required to find the ALJ's reasoning clear and convincing.").

## C.   Step 3 Findings Concerning Listing 4.02 for Chronic Heart Failure

Plaintiff contends error at step three of the sequential evaluation, as the ALJ found that the Plaintiff did not meet Listing 4.02 for chronic heart failure, but the ALJ did not provide any analysis regarding whether the Plaintiff medically equaled Listing 4.02.  Plaintiff argues the only finding that

1    is not as severe as specified in the Listing is the requirement for twelve (12) hours of emergency

2    room treatment.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.02(B)(2).  Specifically, on January 31,

3    2019, he only received ER treatment for approximately five (5) hours (AR 4544-50); and on June 17,

4    2019, he received ER treatment for approximately 10 hours and 45 minutes (AR 4048-52).  Plaintiff

5    submits substantial evidence supports that the Plaintiff medically equals Listing 4.02.

6           The ALJ made the following findings at step three:

7               The record does not establish the medical signs, symptoms,
                laboratory findings or degree of functional limitation required to
8               meet or equal the criteria of any listed impairment.

9               The claimant's representative argues Listing 4.02 is met. However,
                the requirements of subsection B of that listing is not satisfied, in
10              particular, as the record shows the claimant is able to perform
                activities of daily living independently, the record fails to show the
11              requisite number of acute congestive heart failure episodes, and
                there is no evidence of inability to perform an exercise test. The
12              claimant's representative argues Listing 4.02B(2) is met, citing
                Exhibits 17F/411 and 240, as well as 14F/79. While the episode at
13              Exhibit 17F/411 appears to meet listing criteria, the episode at
                Exhibit 17F/240 does not. During the latter, the claimant went in
14              for chest pain, but there was no edema present on exam and the
                claimant was discharged after improvement with Lasix, so no
15              admission or further intervention was needed. (Exhibit 17F/234,
                236, 240.) The record fails to show three or more episodes of acute
16              congestive heart failure episodes meeting listing requirements.

17   (AR 19.)

18          Defendant argues, "[a]s a threshold matter, while Plaintiff argues that the ALJ did not

19   articulate any analysis as to equivalence, none was required because Plaintiff never argued that

20   he medically equaled Listing 4.02 or raised any theory of equivalence to the ALJ (AR 39–40)."

21   (Opp'n 17.)  Plaintiff argues this is incorrect based on the hearing testimony.  At the hearing, the

22   following exchange occurred:

23              ALJ:  Do you contend that any of the Claimant's impairments meet
                or equal a listing?
24
                ATTY:  I do, Your Honor.  Listing 4.02, chronic heart failure,
25              criteria A, the Claimant has had echocardiograms reporting
                ejection fraction of less than 20%.  That is noted in 12F, page 45.
26              Also, another echocardiogram done, this is noted on 15F, page 174
                and 5. Also in 19F, I have page 215 through 217, there's another
27              echocardiogram with less than 20% EF. Regarding the B criteria,
                I'm looking at #2,the Claimant has had three or more episodes of
28              acute congestive heart failure within a 12-month period.  These are

                                              30

reported in 17F, page 411, this is from October 2018, 17F, page 240, January 2019, and thirdly, 14F, page 79, this is January – I'm sorry, June 2019.

(AR 39-40.)  Both parties cite to this portion of the testimony.  While Defendant's argument is a bit unclear given the above testimony, it appears Defendant is arguing no plausible theory of equivalence was prevented, but rather only arguments pertaining to meeting the listing.  See Kennedy v. Colvin, 738 F.3d 1172, 1176 (9th Cir. 2013) (noting "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment.") (citation omitted).  The arguments presented at the hearing were confined to the precise listing criteria for 4.02.

The Court finds Plaintiff has not established a basis for remandable error.  To satisfy Listing 4.02, a claimant must present medical documentation showing that he satisfies 4.02(B)(1), 4.02(B)(2), or 4.02(B)(3).  Plaintiff argues he satisfied 4.02(B)(2), which requires: (1) three or more separate episodes of acute congestive heart failure within a consecutive 12-month period with; (2) evidence of fluid retention from clinical and imaging assessments at the time of the episodes; and (3) requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization.   20 C.F.R. Pt. 404, Subpt. P, App. 1 § 4.02(B).   "(T)he phrase periods of stabilization means that, for at least 2 weeks between episodes of acute heart failure, there must be objective evidence of clearing of the pulmonary edema or pleural effusions and evidence that you returned to, or you were medically considered able to return to, your prior level of activity." See 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 4.00(D)(4)(c).

Setting aside the parties dispute over the precise timing of one ER visit,[11] Plaintiff does not dispute that he failed to meet the strict requirements of Listing 4.02, and instead he argues

---

[11]  The parties dispute the precise timing of one ER visit.  Defendant argues Plaintiff misstates that he was treated for approximately 10 hours and 45 minutes, as his medical records showed that intake occurred at 21:56 PDT on and he was discharged at 23:29 PDT.  (AR 4048, 4052.)  Defendant mistakenly writes 2021 here.  Plaintiff replies that the record clearly states that the Plaintiff was seen face-to-face at 12:44, was reexamined at 22:30, and the chart was signed by the physician at 23:29, (AR 4048, 4051-52), and therefore, Plaintiff was treated in the emergency room for approximately 9-10 hours on June 17, 2019.  The Court need not resolve this dispute, as either reading is less than 12 hours.

1  that he medically equaled Listing 4.02.  The Court agrees with Defendant that Plaintiff's

2  argument appears to be that he almost met Listing 4.02's requirements, but this is insufficient as

3  a matter because he fails to establish that his treatment was equal to Listing 4.02's level of acute

4  care, and offers no explanation or evidence showing that there were medical findings, "equal in

5  severity to all the criteria."  See Kennedy, 738 F.3d at 1174 ("Kennedy, who has an IQ score of

6  71, acknowledges that he does not meet Listing 12.05C, but contends that he equals the listing,[,]

7  [however] [w]e conclude that he does not [as a] claimant must 'present medical findings equal in

8  severity to all the criteria for the one most similar listed impairment[,]' [and] Kennedy did not

9  show that his impairments medically equal an IQ score of 60 to 70, so he has not shown

10  equivalence to all three individual criteria under Listing 12.05C, and his condition thus does not

11  equal the listing." (quoting Sullivan v. Zebley, 493 U.S. 521, 531, 110 S.Ct. 885, 107 L.Ed.2d

12  967 (1990))); Fruits v. Colvin, No. CV-12-02448-PHX-DGC, 2013 WL 5655563, at *3 (D. Ariz.

13  Oct. 17, 2013) ("An impairment is medically equivalent to a listed impairment if it is at least

14  equal in severity and duration to the criteria of any listed impairment . . . [the Listing] language

15  requires evidence of fluid retention, acute extended physician intervention for 12 hours or more,

16  separated by periods of stability . . . [o]ther measurements cited by Plaintiff were not made

17  during episodes that required extended physician intervention such as hospitalization or

18  emergency room treatment for 12 hours or more, or were not separated by periods of stability

19  [and] [o]nly the November 2008 and September 2010 hospitalizations required extended

20  physician intervention or were separated by periods of stability as contemplated by Subsection

21  B2."); Jackson v. Berryhill, No. 5:17-02403 ADS, 2019 WL 161729, at *6 (C.D. Cal. Jan. 9,

22  2019) ("For Plaintiff to be found disabled under this Listing, he needs to establish the

23  requirements in part A as well as part B; part A alone is insufficient."); c.f. Gonzalez v. Comm'r

24  of Soc. Sec., No. 1:20-CV-00336-EPG, 2021 WL 2808561, at *2 (E.D. Cal. July 6, 2021) ("The

25  ALJ did not mention Listing 4.02 or Plaintiff's chronic heart failure at step three . . .[t]he ALJ's

26  decision does not indicate whether he considered the evidence regarding Plaintiff's chronic heart

27  failure before concluding that her impairments do not meet or equal any listing [and] [t]herefore,

28  the ALJ erred at step three.").

As the Ninth Circuit explained:

> *Zebley* held that, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment." *Id.* at 531, 110 S.Ct. 885 (citing 20 C.F.R. § 416.926(a) (1989)). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Id.* The reason for this is clear. Listed impairments are purposefully set at a high level of severity because "the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Id.* at 532, 110 S.Ct. 885. When a claimant meets or equals a listing, "he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work." *Id.* Listed impairments set such strict standards because they automatically end the five-step inquiry, before residual functional capacity is even considered.

<u>Kennedy</u>, 738 F.3d at 1176.

Accordingly, the Court concludes Plaintiff has not demonstrated remandable error by the ALJ at step three.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

2

## V.

### CONCLUSION AND ORDER

In conclusion, although Plaintiff suffers from a number of severe physical ailments, based on the parties' arguments, the record as a whole, the ALJ's opinion, and the applicable law, the Court finds no error warranting remand of this action.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's motion for summary judgment is DENIED, Defendant's cross-motion for summary judgment is GRANTED, and Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Joseph Luis Sepulveda.  The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:   **July 21, 2023**

UNITED STATES MAGISTRATE JUDGE